UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF APPLE IPHONE 14 PRO MAX LOCATED ON OR AROUND THE PERSON OF MICHAEL STEPHEN FIELDS | Case No. 5:24-MJ-5046-MAS |

**AFFIDAVIT IN SUPPORT OF AN**
**APPLICATION UNDER RULE 41**
**FOR A WARRANT TO SEARCH AND SEIZE**

I, John Z. Downing being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since March 2020. I am currently assigned to the Louisville Division of the FBI, specifically the Joint Terrorism Task Force (JTTF), and I work on a variety of criminal and national security matters. From 2013 to 2020, I was a Police Officer for the University of Kentucky Police Department in Lexington, Kentucky. From 2017 to 2020, I was assigned to the FBI Joint Terrorism Task Force as a Task Force Officer. I am currently assigned to the Lexington Resident Agency of the Louisville Field Office, which conducts investigations into gangs, drugs, violent crimes against children, financial crimes, and terrorism. My duties, responsibilities, and training as a Special Agent with the FBI include investigating violations of federal law. I have been involved in the execution of search and arrest warrants. I have experience investigating national security threats, to include international terrorism and domestic terrorism. As a federal law enforcement officer, I am authorized to execute search and seizure warrants under Rule 41 of the Federal Rules of Criminal Procedure.

1

2. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedures for a warrant to search MICHAEL STEPHEN FIELDS's Apple iPhone 14 Pro Max (hereinafter DEVICE) further described in Attachment A, for things described in Attachment B.

3. The facts in this affidavit come from my personal observations, my training and experience, and information provided from other agents, witnesses, and agencies. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4. Based on my training and experience and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that a violation of 18 U.S.C. § 930(a) (Possession of firearms and dangerous weapons in Federal facilities) have been committed by Michael Stephen FIELDS. There is also probable cause to search the DEVICE, further described in Attachment A, for the things described in Attachment B.

## PROBABLE CAUSE

5. On January 28 through 31, 2024, the FBI obtained information about a possible criminal violation committed at a United States Marine Corps (USMC) Reserves building, a federal facility as defined by 18 U.S.C. § 930, located in Lexington, Kentucky.  Specifically, USMC Reserves Captain Banner Wolf, currently employed as a police officer with the Anaheim Police Department in Anaheim, California and serving in the USMC Reserves as the Executive Officer for Military Police Company Alpha, 4th Law Enforcement Battalion (hereinafter "Alpha Company"), which is located in Lexington, Kentucky, reported to the FBI that MICHAEL STEPHEN FIELDS possessed a personal firearm in a USMC Reserves building, in violation of 18 U.S.C. § 930(a).  She also reported that USMC Reserve officers are not permitted to possess

2

personal firearms on the grounds, and thus FIELDS is not authorized by law to have a firearm on the premises.

6. Alpha Company held drill from January 26-28, 2024, at 151 Opportunity Way, Lexington, Kentucky. During this drill and pursuant to a company-level medical evaluation referred to as a "medical stand-down", Captain Wolf became aware of suicidal and homicidal thoughts self-reported by Lance Corporal FIELDS, who is assigned to Alpha Company, on January 27, 2024. Additionally, FIELDS self-reported that he was in possession of a personal firearm, located inside his backpack, on the property inside the building.

7. As a result of these admissions by FIELDS, USMC Reserves officials located his backpack inside a USMC Reserves building. Inside the backpack, USMC Reserves officials located a loaded and charged firearm, specifically a Smith and Wesson M&P 9mm pistol, serial number NJN2523, along with a pocketknife. These items were secured in the building's armory, and FIELDS was transported to the University of Kentucky Albert B. Chandler Hospital, located at 800 Rose Street, Lexington, Kentucky 40536, for a mental evaluation. FIELDS met with a psychologist via Zoom, and it was determined to not hold FIELDS for 72-hours for further evaluation.

8. Captain Wolf coordinated with USMC Criminal Investigative Division (CID) regarding a Permissive Authorization For Search and Seizure Form specific to FIELDS's cellular telephone. Section 2 of the Permissive Authorization For Search and Seizure Form is titled "Constitutional Right," and states "I have been informed of my constitutional right to refuse to permit this search in the absence of a search warrant. In full understanding of this right, I have nevertheless decided to permit this search to be made." FIELDS initialed "MSF" at the beginning and the end of the above listed statement listed within Section 2. FIELDS signed the form, and

Captain Wolf subsequently seized and reviewed FIELDS's personal cell phone pursuant to the authority FIELDS consented to when he signed the form.

9. Captain Wolf located two text message chains of significance thereon. The first text message chain took place on January 27, 2024, and referenced being taken to the emergency room for the mental evaluation. The second text message chain took place on January 15, 2024, and referenced being on depression and anxiety medications to keep from "kms", seeing visions, and not taking the medications in a while. [Affiant believes "kms" to be a reference to "kill myself".] In the text chain, FIELDS stated he had a traumatic experience, specifically his "buddy killed himself 50 yards from me when I was in combat school." Captain Wolf did not make any notable observations during a cursory review of FIELDS's social media accounts and photographs.

10. Captain Wolf advised of other recent, concerning changes in FIELDS's life, including his recent and observable weight gain and that his brother was recently killed during a police-involved shooting in Nicholasville, Kentucky. Due to the above-mentioned factors, including the reports of suicidal and homicidal thoughts, unlawful possession of a personal firearm in a prohibited location – that is, a federal facility, the text messages regarding recent mental evaluations, depression, and being off his medications, his recent weight gain, and his recent personal tragedy, Captain Wolf contacted the FBI tip line and the Georgetown Police Department to report her concerns.

11. On January 28, 2024, Georgetown Police Department interviewed FIELDS at his parents' residence where he also resides in Georgetown, Kentucky. During conversation with officers, FIELDS never indicated that he wanted to hurt himself or anyone else. FIELDS did

4

mention to officers that he was at a very low point in his life and was struggling mentally. Officers described FIELDS as being "very tense and very stressed."

12.  On February 1, 2024, Affiant conducted open-source research to locate the date of the officer involved shooting that killed FIELDS brother. Affiant located a post online stating a Jessamine County Sheriff's Deputy was involved in a shooting on November 20, 2023, and within the comments section of the post were numerous posts reading "RIP Anthony Fields". Affiant believes this is the incident FIELDS has referred to when speaking with Alpha Company and the time that parties have indicated his mental health began to drastically decline.

13.  On January 31, 2024, Affiant spoke with the Inspector Instructor of Alpha Company. The Inspector Instructor explained that the firearm was confiscated in a backpack within the facilities gym, unattended, and identified the firearm as a Smith & Wesson M&P pistol bearing serial number NJH2523. Below are photographs of the firearm which were taken on January 31, 2024, after the weapon had been made safe and stored:



5



14. On February 2, 2024, Special Agent Jack Morgan with the Bureau of Alcohol, Tobacco, Firearms, and Explosives queried the serial number (NJH2523) of the Smith & Wesson pistol in a law enforcement database and discovered the firearm had been sold to J.H. on December 5, 2023, at EZ Pawn, which is in Georgetown, KY. SA Morgan contacted EZ Pawn and spoke to the manager. The manager advised the firearm was brought back into the store by J.H. on December 15, 2023 and later put out on display for sale, when, on January 23, 2024, FIELDS came into the store and put the above-referenced Smith & Wesson pistol on layaway. FIELDS returned to the store on January 25, 2024 at approximately 11:30 a.m., completed the background check, and purchased the pistol for $250. This was just days before drill was to begin.

15. An interview with a Lexington Police Officer who personally knows FIELDS demonstrates that FIELDS used the DEVICE to communicate about his intent to possess a firearm. On January 31, 2024, a member of Alpha Company, who is also a Lexington Police Officer, explained that approximately one week before drill, FIELDS text messaged him asking

6

about the handgun carry laws for the State of Kentucky. The Lexington Police Officer responded to FIELDS explaining Kentucky is a constitution carry state.

16. The previous search of the DEVICE conducted with the express consent of FIELDS demonstrates that FIELDS used his phone to research the commission of felony offenses. As mentioned previously, Captain Wolf reviewed FIELDS's cellular phone. In FIELDS's Safari browser history, Captain Wolf found searches for "cartel execution featuring scalping and heart removal", "Christchurch Mosque Shooting", handguns, holsters, body armor, and knives. Captain Wolf advised the reviewable history only dated back one month and observed all the searches to be within a condensed period of time, approximately January 7 through January 23, 2024. Officers questioned FIELDS about the videos that were discovered on his phone and FIELDS explained he sometimes views those types of videos out of curiosity.

17. Based on my training and experience and information gleaned through this investigation, I believe it is likely that DEVICE contains evidence relating to violations of 18 U.S.C. § 930(a) (Possession of firearms and dangerous weapons in Federal facilities) by FIELDS.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

18. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

19. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how

the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

20. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

21. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## BIOMETRIC ACCESS

22. Based on the foregoing, I reasonably suspect that FIELDS committed the criminal offense described herein, and I reasonably suspect that the DEVICE will be unlocked utilizing FIELDS's biometrics. Consequently, this application also seeks authority to compel FIELDS to provide biometric access to unlock the DEVICE subject to seizure pursuant to this warrant. The grounds for this request are as follows:

   a. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that Apple offers its users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d. If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and

activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f. The passcode or password that would unlock the DEVICE subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the DEVICE, making the use of biometric features necessary to the execution of the search authorized by this warrant.

g. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since

11

the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h. Due to the foregoing, if the DEVICE that is subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of FIELDS to the fingerprint scanner of the DEVICE found at the premises; (2) hold the DEVICE in front of the face of FIELDS and activate the facial recognition feature; and/or (3) hold the DEVICE in front of the face of FIELDS and activate the iris recognition feature, for the purpose of attempting to unlock the DEVICE in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to compel that any individual at the PREMISES state or otherwise provide the password or any other means that may be used to unlock or access the DEVICE. Moreover, the proposed warrant does not authorize law enforcement to compel any individual at the PREMISES to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the DEVICES.

## CONCLUSION

23.     Based on the foregoing, I believe that probable cause exists to believe that there have been violations of 18 U.S.C. § 930(a) (Possession of firearms and dangerous weapons in Federal facilities) by Michael Stephen FIELDS and that the evidence of such violation exists in the DEVICE. Therefore, I request that the Court issue the proposed search warrant.

24.     I respectfully request that the Court issue a warrant authorizing the search of the DEVICE described in **Attachment A** for the evidence described in **Attachment B**.

25.     I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process.  For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises.  Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

## REQUEST FOR SEALING

26.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of these applications. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that online criminal actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

/s/ John Z. Downing

John Z. Downing
Special Agent
Federal Bureau of Investigation

Attested by reliable electronic means per FRCrP 4.1 on this 2nd day of February, 2024.

MATTHEW A. STINNETT
United States Magistrate Judge